Mogens GJERLOV and Jacob Verschoor,
Plaintiffs–Appellees,

v.

SCHUYLER LABORATORIES,
INC., Defendant–Appellant.

No. 97–1089.

United States Court of Appeals,
Federal Circuit.

Dec. 1, 1997.

Rehearing Denied Dec. 29, 1997.

Edmund J. Sease, Zarley, McKee, Thomte, Voorhees & Sease, P.L.C., Des Moines, IA, argued for plaintiffs-appellees.

Steven Paul DeVolder, Lewis, Webster, Johnson, Van Winkle & DeVolder, Des Moines, IA, argued for defendant-appellant.

Before ARCHER, Chief Judge, MICHEL, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

This case concerns choice of law between federal patent law and state contract law regarding the measure of damages for breach of a settlement agreement and related attorney fees and costs. We hold that while patent law provides the basis for federal jurisdiction, here state contract law provides the grounds for decision.

In this appeal, Schuyler Laboratories, Inc. ("Schuyler") challenges orders of the United States District Court for the Southern District of Iowa: (1) holding Schuyler had breached its Settlement Agreement and Release (the "Agreement") with Mogens Gjerlov and Jacob Verschoor ("Patentees"), *Gjerlov v. Schuyler Laboratories, Inc.*, No. 4–93–70312 (July 25, 1995) (order granting motion to enforce settlement agreement); and (2) awarding Patentees Patent Act damages, attorney fees and costs upon the finding of breach but not infringement, *id.* (Sept. 30, 1996) (order accepting the magistrate judge's report and recommendation on damages). Applying the Patent Act, the district court awarded $343,200.00 as a reasonable royalty, and $14,065.00 as reasonable attorney fees and $20,877.80 for costs for an "exceptional" case based on willful acts.

This appeal was submitted for our decision following oral argument on October 8, 1997. Because the district court's interpretation of the Agreement was correct, and its finding that the Agreement was breached was not clearly erroneous, we affirm as to liability for breach. The district court's award of damages, however, was improperly premised on 35 U.S.C. § 284, and its award of attorney fees and costs on 35 U.S.C. § 285. We, therefore, vacate and remand as to damages, fees and costs.

## BACKGROUND

Patentees sued Schuyler in the early 1990s for infringement of U.S. Patent No. 5,038,396 ("the '396 patent"). The '396 patent covers a psyllium-based calf oral rehydrant. The product made in accordance with the patent is used to treat calves that become dehydrated. Its significant percentage of psyllium represented an improvement over the prior art because psyllium contains polysaccharides that aid in the absorption of the electrolytes, glucose, and fluids necessary for rehydration. Psyllium also slows absorption of the rehydrant by the animal so that fewer doses are needed. The patent lists Mogens Gjerlov as its sole inventor and is owned jointly by Patentees. Patentees are principals in Pharmalett International B.V., a European manufacturer of the patented calf

oral rehydrant product. In the United States, the patented product is exclusively marketed with Patentees' permission under the name DELIVER® by Bayer Corp. ("Bayer").

In October 1993, the lawsuit was settled by the Agreement, and subsequently the district court entered a consent decree, injunction and order disposing of the case (the "consent decree"). The consent decree established that Patentees are the legal owners of the '396 patent and that Schuyler had infringed it. The consent decree also prohibited Schuyler from continuing to infringe, but it did not prohibit Schuyler from manufacturing or selling a new product reformulated in accordance with the specific terms of the Agreement. The consent decree further provided that the district court's jurisdiction based on the complaint of patent infringement continued in order to enforce the terms of the Agreement and the consent decree.

The Agreement provides, *inter alia*, at paragraph 6 that:

> Nothing hereunder shall prohibit Schuyler from manufacturing and selling a product containing electrolytes, glucose and psyllium so long as the amount of *electrolytes and glucose* on the one hand remains *greater than or equal to 69.5% by weight* and the amount of *psyllium* (calculated as 100% pure psyllium husk) on the other hand *is equal to or less than 28.5% by weight*. The parties agree that for purposes of compliance with this paragraph, product *analysis may be made at Iowa State University Testing Laboratories as an independent laboratory* and that *the results shall be respected by the parties.* Schuyler agrees to promptly inform plaintiffs of the first lot number of the new HIGH ENERGY product sold under the terms of this Agreement.

(emphasis added). In this manner, Patentees allowed Schuyler to re-enter the market but with a less efficient and non-infringing product.

After execution of the Agreement, Schuyler reformulated its product and tested it at the Woodson–Tenent Laboratories, Inc. ("Woodson–Tenent"), a private laboratory, before marketing it. The Woodson–Tenent test results, according to Schuyler, showed that the reformulated product met the requirements of the Agreement. Schuyler forwarded the test results and a sample of the new product to Patentees in December 1993. Patentees, however, did not respond to Schuyler because they were waiting to test the final formulation as marketed. Shortly thereafter, Schuyler began selling its reformulated product under the name SKY–HIGH ENERGY.

Gjerlov later purchased samples of Schuyler's reformulated product as marketed and commissioned Dr. Stahr, an analytical chemist heading the Chemistry Laboratory of the Veterinary Diagnostic Laboratory at Iowa State University, to test the samples. Dr. Stahr's test reports showed that the reformulated product contained an insufficient percentage of electrolytes and glucose in breach of the Agreement. The results of two samples tested showed that Schuyler's SKY–HIGH ENERGY contained 57.99% or 59.22% by weight electrolytes and glucose; both percentages were below the 69.5% minimum amount stipulated in the Agreement.

In October 1994, Patentees notified Schuyler that Schuyler was in violation of the Agreement. Schuyler, however, disagreed with Patentees' interpretation of the Agreement and hence Patentees' interpretation of the test results. Therefore, Schuyler did not cease selling its reformulated product. Patentees' test measured the percentage of electrolytes and glucose by interpreting the term "glucose" to mean $C_6H_{12}O_6$ (glucose anhydrous) whereas Schuyler's test measured the percentage of electrolytes and glucose by interpreting the term "glucose" to mean $C_6H_{12}O_6 \cdot H_2O$ (glucose monohydrate). The attached water molecule causes glucose monohydrate to weigh about 10% more than glucose in its anhydrous form; therefore, measuring for glucose monohydrate causes the resulting percentage of electrolytes and glucose to be correspondingly higher as compared to the total weight of the product.

Patentees filed a motion to enforce the Agreement, and the district court conducted an evidentiary hearing to determine whether the term "glucose" as used in paragraph 6 of

the Agreement was ambiguous and what the word "glucose" meant. The district court commenced its analysis by noting that "[g]lucose is a chemical compound symbolized by the empirical formula $C_6H_{12}O_6$. Glucose in its hydrous form is called glucose monohydrate and is symbolized by the empirical formula $C_6H_{12}O_6 \cdot H_2O$." *Gjerlov*, slip op. at 2 (July 25, 1995). Hence, because "glucose" and "glucose monohydrate" are two different compounds, each represented by a different empirical formula, the district court held they cannot be considered the same or interchangeable. The district court also focused on the fact that Schuyler's batch records for both the unreformulated product and SKY–HIGH ENERGY specifically identified the glucose source used as glucose monohydrate. The district court determined that, because Schuyler's own batch records expressly referred to glucose in its monohydrate form, Schuyler knew how to distinguish between glucose and glucose monohydrate. The district court found that the term "glucose" in the Agreement unambiguously referred to glucose in its anhydrous form, $C_6H_{12}O_6$, and not glucose monohydrate, $C_6H_{12}O_6 \cdot H_2O$. The district court further found that even assuming the term "glucose" in the Agreement was ambiguous, the parties intended the term to mean the compound identified as $C_6H_{12}O_6$, and not glucose monohydrate, $C_6H_{12}O_6 \cdot H_2O$. The district court, therefore, granted Patentees' motion to enforce the Agreement and ordered Schuyler to discontinue production and sales of its SKY–HIGH ENERGY product.

The issue of damages was tried subsequently to a magistrate judge. Schuyler presented evidence that it had sold 151,000 pounds (68,640 kgs) of product that failed to meet the minimum requirements stipulated in the Agreement as interpreted by the court. Dr. Verschoor testified for Patentees that Pharmalett would not license their formulation for less than the profit of $6.50 per kilogram it made from sales to its exclusive U.S. licensee, Bayer. After considering other relevant market and production factors, the magistrate judge found $5.00 per kilogram to be a reasonable royalty, totaling $343,200.00 for the product Schuyler admitted selling. The patent statute requires that infringement damages not be less than a reasonable royalty. *See* 35 U.S.C. § 284 (1984). The magistrate judge found, therefore, that because the lost profits proved by Patentees were less than the $343,200.00 total of the reasonable royalty proven, under 35 U.S.C. § 284 Patentees were entitled to recover the $343,200.00 in damages.

The magistrate judge also found that Schuyler's violation of the Agreement was willful, making the case "exceptional" under 35 U.S.C. § 285, and allowed Patentees to recover attorney fees and costs for the period between the filing of the February 6, 1995 motion to enforce through the July 25, 1995 ruling on that motion. The magistrate judge, however, did not allow Patentees to recover attorney fees for the damages proceeding, finding that by the time Schuyler was on notice of the Iowa State University Testing Laboratory test results, most of the infringing, post-settlement sales already had been made.

The magistrate judge relied on section 284 of the Patent Act to award a reasonable royalty as damages and on section 285 to justify awarding fees and costs. The district court judge entered the magistrate's report and recommendations without change. *Gjerlov*, slip op. at 2 (Sept. 30, 1996). Schuyler filed this timely appeal.

## DISCUSSION

◼ Schuyler challenges various findings of fact and legal conclusions upon which the district court relied in granting Patentees' motion and in awarding patent damages, fees and costs. We review the district court's decision in this case, as we would that in any bench trial, *de novo* for errors of law, and under the clearly erroneous standard for findings of fact. *See* Fed.R.Civ.P. 52(a); *Gould v. Quigg*, 822 F.2d 1074, 1077, 3 USPQ2d 1302, 1304 (Fed.Cir.1987). We have jurisdiction over the appeal because the orders appealed from arise under the patent laws since the original claim for relief arose under the patent laws, 28 U.S.C. § 1338(a), and the consent decree disposing of the case contained a provision retaining jurisdiction for purposes of enforcing the Agreement.

# 1020

## I. Breach of the Settlement Agreement

Schuyler contends that the district court erroneously interpreted paragraph 6 of the Agreement because, according to Schuyler: (1) the term "glucose" and the phrase "by weight" together unambiguously refer to the relative weight of glucose not in its anhydrous form ($C_6H_{12}O_6$), but in its monohydrate form ($C_6H_{12}O_6 \cdot H_2O$); (2) even if the term "glucose" as used in the Agreement is ambiguous, the parties intended glucose monohydrate even though the Agreement specified "glucose"; and (3) the Iowa State University laboratory was not the type of laboratory contemplated by the parties and, in any event, was not "independent" as required by the Agreement.

### A. The Meaning of the Term "Glucose" in the Agreement

■ Even though affecting a patent infringement action, breach of the Agreement here presents a question of contract interpretation because its grounds for decision are based on state contract law. The question of interpretation is therefore governed not by federal patent law, but by state contract law. *Interspiro USA v. Figgie Int'l*, 18 F.3d 927, 931, 30 USPQ2d 1070, 1072 (Fed.Cir.1994). In this case, the parties agree that Iowa contract law controls.[1] Under Iowa law, "contract construction"—the process of determining the legal effect of a document—is a legal matter for the court, but "contract interpretation"—the process of determining the meaning of the words used—is a question of fact when extrinsic evidence is required at the trial level. *Berryhill v. Hatt*, 428 N.W.2d 647, 653 (Iowa 1988). Because the dispute concerns the meaning of a word, and the district court considered extrinsic evidence as to that meaning, we review the district court's determination under the clearly erroneous standard. "[E]xtrinsic evidence is admissible as an aid to interpretation when it throws light on the situation or the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain." *Uhl v. Sioux City*, 490 N.W.2d 69, 73 (Ct.App.Iowa 1992) (citing *Dental Prosthetic Servs. v. Hurst*, 463 N.W.2d 36, 39 (Iowa 1990)).

■ The district court held an evidentiary hearing for the specific purpose of determining the meaning of the term "glucose." At that hearing, the district court heard testimony from witnesses for both parties and received other extrinsic evidence on the meaning of the term "glucose" in the Agreement. Schuyler has pointed to no basis for its inferential argument that the district court disregarded the evidence before it. Schuyler merely disagrees with how the trial court weighed the evidence. Nor does Schuyler dispute the legal effect of the Agreement once the disputed words like "glucose" are interpreted. The district court's analysis, we hold, falls under the rubric of "interpretation," and the district court's interpretation of the disputed terms of the Agreement, therefore, is reviewed for clear error. *See* Fed.R.Civ.P. 52(a); *Berryhill*, 428 N.W.2d at 653.

Schuyler argues that the overall purpose and language of the Agreement show that the parties intended the term "glucose" to refer to glucose monohydrate as opposed to the anhydrous form. For example, Schuyler notes that glucose is purchased commercially in its monohydrate form and is generally used as an ingredient in commercial animal health products in its monohydrate form. This is because glucose monohydrate is the stable crystalline form of glucose below 50° Celsius. *See* THE MERCK INDEX 4353 (11th ed.1989) (listing glucose hydrate as the stable form where hydrate means one or more water molecules and monohydrate means one water molecule). Schuyler further argues

1. Although we must look to Iowa contract law for interpretation of the Agreement, this enforcement action was properly in federal district court and is now properly before the Federal Circuit because the original claim for relief arose under the patent laws, 28 U.S.C. § 1338(a), and the consent decree disposing of the case contained a provision retaining jurisdiction in the district court over the settlement agreement for purposes of enforcement. *See Miener v. Missouri Dep't of Mental Health*, 62 F.3d 1126, 1127 (8th Cir.1995) (citing *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 381, 114 S.Ct. 1673, 1677, 128 L.Ed.2d 391 (1995) (ancillary jurisdiction to enforce a settlement agreement exists only if the parties' obligation to comply with the terms of the agreement is made part of the order of dismissal)).

that after consulting the Merck Index and learning that glucose monohydrate is the stable crystalline form of the compound, its attorney had no reason to believe that "glucose" in the Agreement meant anything but "glucose monohydrate."[2]

Schuyler, however, points to nothing that specifies that the term "glucose" actually means glucose monohydrate or that the Agreement should be interpreted to refer to the commercial form of glucose. In fact, Schuyler's own batch records specifically identified the compound that it used to formulate its product as "glucose monohydrate," showing that Schuyler knew the difference between glucose and glucose monohydrate and how to properly describe glucose monohydrate. Furthermore, the Agreement is based, in part, on the '396 patent, and Schuyler has not pointed to anything in the patent showing that "glucose" means glucose monohydrate. Therefore, we cannot say that the district court clearly erred when it interpreted the term "glucose" as used in the Agreement to unambiguously refer to the empirical formula $C_6H_{12}O_6$.

### B. The Meaning of "Iowa State University Testing Laboratories" in the Agreement

█ Similarly, under Iowa contract law, we review the district court's interpretation of the meaning of the contract term "Iowa State University Testing Laboratories" for clear error. *See Berryhill*, 428 N.W.2d at 653. Schuyler asserts that it was improper for the district court to rely on the tests performed at the Veterinary Diagnostic Laboratory at Iowa State University for three reasons.

First, Schuyler argues that the Veterinary Diagnostic Laboratory at Iowa State University was not an appropriate testing laboratory because Dr. Stahr improperly determined the percentage of the glucose component of Schuyler's reformulated product only in its anhydrous as opposed to its monohydrate

form. Schuyler asserts that an appropriate laboratory within the meaning of the Agreement would have known to test for glucose as glucose monohydrate. The appropriate type of laboratory, according to Schuyler, would be a commercial laboratory such as the Woodsen–Tenent Laboratory. However, Schuyler is incorrect. First, paragraph 6 of the Agreement stipulates that the parties intended "Iowa State University Testing Laboratories," not a commercial laboratory such as Woodsen–Tenent. Second, because the district court properly found that glucose in its anhydrous form is, per the Agreement itself, what the parties intended, there was no need for the laboratory to test for glucose as glucose monohydrate.

Next, Schuyler argues that the Veterinary Diagnostic Laboratory at Iowa State University was not the type of laboratory contemplated by the parties to the Agreement. Schuyler points out that the Veterinary Diagnostic Laboratory lacked a protocol to determine the relative weight of psyllium in the reformulated product. According to Schuyler, therefore, the Veterinary Diagnostic Laboratory could not be the type of laboratory intended by the parties because it could not test for the percentages of one of the two principal components of the product as required by the Agreement.

Paragraph 6 of the Agreement, however, requires the parties to accept results from the "Iowa State University Testing Laboratories as *an* independent laboratory ..." (emphasis added). This sentence is correctly interpreted to mean that the various Iowa State University Testing Laboratories are considered one laboratory for the purposes of testing pursuant to the Agreement. Nor does Schuyler dispute that other laboratories within the class of "Iowa State University Testing Laboratories" have the protocols for testing for psyllium. Finally, because the electrolytes and glucose percentage tested by the Veterinary Diagnostic Laboratory was below the minimum amount required under the Agreement, it was not necessary for Pat-

---

**2.** The Merck Index does not unambiguously identify "glucose" as "glucose monohydrate." To the contrary, the first identification given for glucose after the synonyms in the Merck Index is its empirical formula $C_6H_{12}O_6$. Later in the para-

graph, glucose hydrate is identified as the stable crystalline form below 50° C, and glucose anhydrous is obtained above 50° C. THE MERCK INDEX at 4353.

entees also to have tests conducted for the psyllium content in order to determine whether the Agreement was breached. Therefore, the district court did not clearly err in determining that the Veterinary Diagnostic Laboratory was an appropriate laboratory under the Agreement.

■ Third, Schuyler argues that the Veterinary Diagnostic Laboratory headed by Dr. Stahr was not an "independent laboratory" as required by paragraph 6 of the Agreement because Dr. Stahr was contacted by Patentees without input from Schuyler. Nothing in the Agreement, however, requires notice to or input by Schuyler. Indeed, the Agreement at paragraph 6 simply states that the results from testing performed at Iowa State University Testing Laboratories "shall be respected by the parties." Therefore, Schuyler has not shown clear error in the district court's finding that the Veterinary Diagnostic Laboratory was an independent laboratory as required by the Agreement.[3] Moreover, under the terms of the Agreement, any laboratory at Iowa State University was by definition independent. After all, paragraph 6 refers to the University laboratories "as an independent laboratory." See ¶ 6 of the Agreement, ante.

In sum, Schuyler has not shown clear error in the district court's interpretation of the meaning of the term "glucose" as used in the Agreement or its finding that the Veterinary Diagnostic Laboratory was a proper laboratory under the Agreement. We therefore leave undisturbed these findings and affirm the district court's holding of liability for breach of the Agreement.

## II. Legal Basis for Setting Damages as a Reasonable Royalty

■ The damages issues were tried to a magistrate judge who presented a long and thorough report and recommendation which the district judge entered without change. The magistrate judge based his damages rec-

ommendation on the damages provision of the patent statute, 35 U.S.C. § 284, and suggested a reasonable royalty for Schuyler's "further infringement of the type proscribed by the consent decree." *Gjerlov,* slip op. at 13, 23 (Apr. 30, 1996) (magistrate judge's report and recommendation on damages). Despite such language, neither the magistrate judge nor the district judge ever found infringement, only breach of the Agreement, which, as explained *post,* are not synonymous. The court awarded a royalty because the proven lost profits were lower. In applying section 284, the magistrate judge relied upon this court's decision in *Interspiro,* 18 F.3d at 933, 30 USPQ2d at 1074, which held that a motion to enforce a patent infringement settlement agreement, like the underlying suit, arose under the patent laws, and therefore, the district court properly retained jurisdiction. However, the district court misread the holding in *Interspiro.*

### A. The Royalty Determination In *Interspiro*

The patentee in *Interspiro* charged the defendant with breach of an agreement settling a patent infringement suit. The terms of the settlement agreement required defendant to pay specified royalties on sales of products covered by the patent. Jurisdiction over the patent infringement action, of course, arose under 28 U.S.C. § 1338(a), and the settlement agreement expressly manifested the district court's intent to retain jurisdiction over disputes arising out of the settlement of the action for two years from the date of execution. *Id.* at 930, 30 USPQ2d at 1071.

Shortly thereafter, defendant began selling a new product without paying royalties on it. A dispute arose over whether this new product was covered by the patent and hence the settlement agreement. Plaintiff moved to enforce the settlement agreement.

---

**3.** Schuyler also asserts that Dr. Stahr's laboratory was not an independent laboratory because Patentees' attorney had former business contacts with Dr. Stahr. Specifically, about five years prior to the present litigation, Patentees' attorney had prosecuted a patent for Iowa State University in which Dr. Stahr was involved. We find this

argument unpersuasive, for even assuming the attorney and Dr. Stahr worked together directly in the past, that does not, by itself, make the Veterinary Diagnostic Laboratory, an institution, insufficiently "independent" for purposes of the Agreement. Nor will we assume personal bias on so slim a ground.

The settlement agreement required defendant to pay royalties on sales of products covered by the underlying patent. *Id.* at 930, 30 USPQ2d at 1072. Whether or not the settlement agreement was breached, therefore, turned simply on whether or not the defendant's new product infringed the patent. *Id.* The issues of breach and infringement were therefore intertwined. The district court in *Interspiro* conducted a detailed post-settlement infringement analysis and found that defendant's new product did indeed infringe the patent. *Id.* at 930–31, 30 USPQ2d at 1072. Therefore, defendant's sale of its new product without paying royalties under the settlement agreement breached that agreement.

## B. The District Court's Misplaced Reliance on *Interspiro*

The magistrate judge relied upon *Interspiro* for the broad proposition that:

damages for breach of a patent infringement settlement agreement should be governed by the rules pertaining to damages recoverable in a patent infringement action, 35 U.S.C. § 284, including an award of reasonable attorney fees in "exceptional cases." 35 U.S.C. § 285.

*Gjerlov,* slip op. at 12 (Apr. 30, 1996). However, *Interspiro* did not so hold; the magistrate judge's reliance on it for that proposition was therefore misplaced.

This case, like *Interspiro,* arises under the patent laws because it was an action for patent infringement, and the district court correctly retained jurisdiction to enforce the Agreement. *See* 28 U.S.C. § 1338(a); *Miener,* 62 F.3d at 1127; *Interspiro,* 18 F.3d at 930, 30 USPQ2d at 1071–72. Also, as in *Interspiro,* the district court in this case correctly applied state contract law to interpret provisions of the Agreement. *See* Section I, *ante.* However, reliance on *Interspiro* for the broad proposition that breach of a patent settlement agreement requires damages of not less than a reasonable royalty under 35 U.S.C. § 284 is misplaced. Nor does any other case extend section 284 to broadly encompass non-patent issues in cases arising under the patent laws. Before section 284 could apply to the damages determination in this case, the district court first must have found infringement of the underlying patent.

In the present case, as in *Interspiro,* the district court found breach of the Agreement, but contrary to *Interspiro,* breach of the Agreement here does not itself establish infringement of the patent. The percentage of electrolytes and glucose that Schuyler agreed not to sell and the percentage that the rest of the public is excluded from selling by the patent are not the same.

Under the Agreement, Patentees by concession agreed, *inter alia,* to release Schuyler from liability for infringement of the '396 patent occurring prior to November 30, 1993. In return, Schuyler conceded, *inter alia,* that any new product it manufactured or sold would have an amount of electrolytes and glucose greater than or equal to 69.5% by weight. *See* ¶ 6 of the Agreement, *ante.* The claims of the '396 patent, however, cover only a range of 40 to 60% electrolytes and glucose. Hence, the minimum percentage of electrolytes and glucose that Schuyler's product must have in order to avoid breach of the Agreement is higher than that claimed in the underlying patent. In effect, the Agreement precludes Schuyler from making oral rehydrants having a percentage of electrolytes and glucose at least 9.5% above the upper limit of the range claimed in the patent.

■ Determining whether Schuyler breached the Agreement by failing to meet one of the requirements of the Agreement does not require a finding of infringement of the '396 patent. Infringement of a claim in a patent requires that all of the limitations of that claim be met either literally or under the doctrine of equivalents. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992). In order to find patent infringement, the district court would need to have made a specific ruling on the presence in the accused product of each limitation of a claim in the '396 patent. If even one of those limitations was not present in the accused product, the product would not infringe the patent. In the present case, the district court did not undertake an infringement inquiry; it merely found that the

Agreement had been breached because the glucose requirement had not been met. Breach of the Agreement does not equal infringement of the patent.

The magistrate judge, therefore, clearly erred when he suggested that Schuyler's breach of the Agreement resulted in "further infringement of the type proscribed by the consent decree and the damages claimed are as a consequence of that infringement." *Gjerlov*, slip op. at 13 (Apr. 30, 1996). There was no finding of patent infringement; the court simply found that the Agreement had been breached. *Gjerlov*, slip op. at 3 (July 25, 1995). In fact, infringement of claim 1 (or any claim) of the patent could not have been found based on the evidence before the district court because claim 1 requires, *inter alia*, 20 to 70% psyllium, and Patentees did not determine the percentage of psyllium present in the reformulated product.

Determining damages in this case under 35 U.S.C. § 284, therefore, was improper because Schuyler had not been shown to be infringing the patent, and there was no actual finding of infringement. Similarly, relying on *Interspiro* for the proposition that breach of a patent settlement agreement automatically invokes section 284, and hence determining damages at a minimum of a reasonable royalty likewise was improper. Unlike *Interspiro*, breach of the Agreement was not based on infringement of the patent; hence, in this case, the issues of breach and infringement are not intertwined. Therefore, rather than the higher of lost profits or a reasonable royalty for patent infringement under section 284, damages should have been determined under state law regarding damages for breach of contract.

Accordingly, we vacate the determination of damages under 35 U.S.C. § 284 and remand for re-determination under Iowa state law.

## III. Legal Basis for Awarding Attorney Fees and Costs

The magistrate judge suggested that Schuyler's breach was willful, and the case therefore "exceptional," and that the district court should use its presumed discretionary authority to award Patentees reasonable at-

torney fees and costs for the period from the filing of the February 6, 1995 motion to enforce the Agreement through the July 25, 1995 ruling on that motion. Again relying on *Interspiro*, which stands only for the proposition that an action for breach of a patent settlement agreement arises under the patent laws, the magistrate judge based his recommendation of attorney fees on 35 U.S.C. § 285, the statutory provision authorizing the discretionary award of attorney fees for willful infringement or litigation misconduct that make a case "exceptional." As previously discussed, the district court entered the magistrate judge's report and recommendation without change.

### A. The Award of Attorney Fees in *Interspiro*

The magistrate judge misread *Interspiro*, which factually is the converse of the present case. In *Interspiro*, defendant argued to this court that the district court did not have the authority to award attorney fees under section 285 because the case for enforcement of the settlement agreement was premised solely on a breach of contract, thus involving only non-patent issues. 18 F.3d at 933, 30 USPQ2d at 1074. This court, however, held that the finding that defendant breached the agreement depended solely on the fact that the product infringed the patent. *Id.* This court held that "the 'nonpatent' issues in this case, such as assessment of royalties based on the settlement agreement, are 'so intertwined with the patent issues' as to make section 285 applicable to the case in its entirety." *Id.* (quoting *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1564, 219 USPQ 377, 387 (Fed.Cir.1983)). That was clearly so, since finding breach of the settlement agreement was dependent upon finding infringement of the patent. Hence, this court affirmed the district court's award of attorney fees under section 285.

### B. The District Court's Misplaced Reliance on *Interspiro*

In the present case, the magistrate judge found that the result of Schuyler's breach of the Agreement was "further infringement of the type proscribed by the consent decree,"

*Gjerlov*, slip op. 13 (Apr. 30, 1996). The magistrate judge further concluded that "the enforcement of the decree is a continuation of the patent action to which Sections 284 and 285 should apply." *Id.* The magistrate judge found that once Schuyler had the opportunity to review the Iowa State University Testing Laboratory analysis, the continued sale of its product in violation of the Agreement was willful and thus the case was "exceptional" under section 285:

> The continued sale of HIGH ENERGY [sic] and resistance to enforcement of the settlement agreement was willful.... The unambiguous language of the settlement agreement and the Iowa State lab analysis provide the requisite clear and convincing evidence for this conclusion. Accordingly, the Court finds exceptional circumstances exist to award plaintiffs their reasonable attorney fees incurred in connection with the filing of their February 6, 1995 motion for enforcement through to the July 25, 1995 ruling on that motion.

*Id.* at 26 (footnote and citations omitted). As noted before, these findings and recommendation were accepted and entered by the district judge without change.

▮ Although, as suggested by the magistrate judge, it may be "unjust to require plaintiffs to bear their legal expenses for enforcing the settlement agreement against a clear violation of unambiguous terms," *id.* at 27, section 285 of the Patent Act is not the proper statutory provision upon which to rely. "When an action embraces both patent and non-patent claims, no fees under section 285 can be awarded for time incurred in litigation of the non-patent issues." *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 475, 227 USPQ 368, 374 (Fed.Cir.1985) (citing *Stickle*, 716 F.2d at 1564, 219 USPQ at 387). Unfortunately, while over-relying on *Interspiro*, the court was apparently unaware of *Machinery*; reading *Interspiro* in conjunction with *Machinery* provides helpful guidance when dealing with the applicability of section 285 fees.

Since breach of the Agreement does not require infringement of the patent, and no infringement of the '396 patent was found by the district court, the non-patent issues here are not "so intertwined with the patent issues" to make section 285 applicable. *Interspiro*, 18 F.3d at 933, 30 USPQ2d at 1074; *Machinery*, 774 F.2d at 475, 227 USPQ at 374. Patentees, therefore, cannot be entitled to fees and costs under section 285 of the patent statute. Rather, a request for an award of fees and costs for breach of the Agreement invokes state law, and therefore, only Iowa law can be the proper basis for any award of attorney fees and costs. We therefore vacate and remand for re-determinations as to attorney fees and costs under Iowa state law. The district court is familiar with Iowa state law and should make any award of fees and costs in the first instance if Iowa law provides such a basis.

## CONCLUSION

The district court did not clearly err in holding that by producing a reformulated product containing a component that failed to meet the mandatory minimum percentage permitted by the Agreement, Schuyler breached the Agreement. However, damages, attorney fees and costs could not be based upon the patent statute because violation of the Agreement did not mean infringement of the patent, and the court below did not independently find infringement, but only breach of contract (the Agreement). Therefore, reasonable royalty for patent infringement under section 284 was not the proper measure of damages, and award of attorney fees and costs under section 285 likewise was improper. Rather, damages, attorney fees and costs must be determined under Iowa state law. Accordingly, the district court's liability order is affirmed, but its order on damages, fees and costs is vacated and those issues are remanded for re-determination below. *AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*

## COSTS

Costs to appellant.