U.S. VALVES, INC., Plaintiff–
Cross Appellant,

v.

Robert F. DRAY, Sr., Defendant–
Appellant,

and

Integrated Molding Technologies,
Defendant.

Nos. 99–1586, 99–1587.

United States Court of Appeals,
Federal Circuit.

May 22, 2000

Katharine V. Jones, of Evansville, Indiana; and Gary K. Price, Johnson, Carroll and Griffith, of Evansville, Indiana, argued for plaintiff-cross appellant.

F. Stephen Sheets, of Evansville, Indiana, argued for defendant-appellant. Of counsel on the brief was Mark D. Perdue, The Zisman Law Firm, PC, of Dallas, Texas.

Before MICHEL, CLEVENGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

Robert F. Dray, Sr. (Dray) exclusively licensed his patent to U.S. Valves, Inc. in 1991. After his business relationship with U.S. Valves deteriorated, Dray himself began manufacturing and selling valves with the patented technology. U.S. Valves sued Dray for breach of contract, claiming that Dray sold valves covered by the licensed patents. Dray counterclaimed, seeking an accounting and damages for unpaid royalties. The district court found that Dray had sold valves in violation of the agreement, issued a permanent injunction bar-

ring Dray from making any further sales, and awarded U.S. Valves damages of $241,351.17. *See U.S. Valves, Inc. v. Robert F. Dray, Sr.,* EV–96–66–C–Y/H (S.D.Ind. Oct. 13, 1998) (*Dray I*). Dray appeals the judgment. U.S. Valves appeals the amount of the damages award. Because the trial court correctly ascertained liability, but misapplied important principles of calculating damages, this court affirms-in-part, reverses-in-part, and remands.

## I.

On September 29, 1992, the U.S. Patent and Trademark Office issued U.S. Patent No. 5,151,282 (the '282 patent) to Dray for the "internal piston valve," which regulates the flow of molten plastic in an injection-molding process. Dray continued-in-part his original patent application and later received U.S. Patent No. 5,258,158 on November 2, 1993. The application for the latter patent was also continued-in-part and resulted in Dray's U.S. Patent No. 5,470,514 on November 28, 1995.

To exploit his invention, Dray, his son Bobby Dray, and Brian Ricci jointly formed U.S. Valves in September 1991. Dray was the majority shareholder and Bobby Dray was in charge of operations. The following month, Dray and U.S. Valves, Inc. completed a license agreement in which Dray granted U.S. Valves "an exclusive right to manufacture, use, sell, advertise and distribute the Licensed Product and to practice and commercialize invention [sic] and any patent thereon and to use the Know–How developed by the Licensor". License agreement, § 1.1. This agreement defined the "Licensed Product" as "the invention disc[losed] by the application(s) referred to in Recital A and in patents which issues there from [sic]." *Id.* § 1.5. This license agreement also specified: "All future improvements, modifications or enhancements of the Licensed Product made by the Licensor shall be Licensed and shall, without payment of additional consideration, be made available to the Licensee...." *Id.* § 5.1. Dray admits that the licensing agreement licensed his three patents to U.S. Valves.

The agreement also obligated U.S. Valves to pay Dray a royalty equal to "twenty percent ... of the Net Selling Price of the Licensed Product sold by Licensee." *Id.* § 4.3. The agreement gave Dray a way to assure correct royalty payments because U.S. Valve agreed to keep "complete and accurate" records, and to make them available "at all reasonable times ... for inspection and copying by Licensor." *Id.* § 4.5.

In January 1994, Bobby Dray asked his father to reduce his royalty rate from twenty to fifteen percent on sales to Van Dorn DeMag, Inc. (Van Dorn). This price reduction allowed U.S. Valves to obtain an order from this prospective new customer. Although Bobby Dray made notes concerning the agreement with Van Dorn, the agreement itself was not memorialized in writing. When the relationship between Dray and U.S. Valves later dissolved, this agreement became the focus of a major dispute. Dray asserts that he agreed to a reduction in royalty only for an initial order from Van Dorn; U.S. Valves asserts that the reduction applied to all sales to Van Dorn.

Van Dorn began to buy valves from U.S. Valves in October 1994. At about the same time, however, disagreements arose between the Drays and Ricci. Ricci purchased Dray's stock in U.S. Valves, and Bobby Dray left U.S. Valves. By the end of 1994, Dray was completely dissociated from U.S. Valves except for the license agreement.

In August 1995, Dray began selling the "Licensed Product" of § 1.5 of the license agreement, which the district court called "the Dray valve," himself. *Dray I,* slip op. at 9. At some point Dray also began to produce and sell another valve – the "sliding ring" valve – which serves the same purpose as the Dray valve. Dray asserts that the sliding ring valve is "substantially

different" from the valve covered by the license agreement, and applied for a patent on the sliding ring valve on May 4, 1998. U.S. Valves, on the other hand, claims that the sliding ring valve is sufficiently similar to the Dray valve to be covered by the license agreement. *See U.S. Valves, Inc. v. Robert F. Dray, Sr.,* 190 F.3d 811, 812 (7th Cir.1999) (*Dray II* ).

In October 1995, Dray asked U.S. Valves for information allowing him to verify his royalty payments, and received information on U.S. Valves' sales and royalties from April through September 1995. On November 17, 1995, Dray attempted to verify his royalty payments by personally inspecting U.S. Valves' accounts. He was unsatisfied by the information he was able to obtain. Consequently, on November 29, 1995, he notified U.S. Valves of his perception that it had violated the license agreement by paying royalties at less than the twenty percent rate in the license agreement. See *Dray* I at 10. This perception arose from Dray's understanding of the January 1994 oral agreement with Bobby Dray.

In fact, U.S. Valves paid royalties to Dray on sales to Van Dorn at a fifteen percent rate until November 1995. *See id.* at 11. In December 1995, U.S. Valves wrote a check for the disputed amount to Dray, but required that he sign a release for "any claim he may have in connection with non-conforming royalties for sales to Van Dorn Demag, Inc., from January 1994 to present." *Id.* at 12. Dray neither signed the release nor cashed the check. Instead, by this time, Dray had himself begun selling products covered by the license agreement, and therefore notified U.S. Valves that he considered the company to have violated the license agreement. He considered the proffer of the disputed amount in the Van Dorn matter a violation by U.S. Valves of their agreement, which granted Dray the right to inspect U.S. Valves' records at "all reasonable times."

On December 21, 1996, U.S. Valves sued Dray in Indiana state court, alleging breach of contract due to his manufacture and sale of valves covered by the license agreement. U.S. Valves also requested the court to enjoin Dray from violating U.S. Valves' rights under the license agreement. On April 4, 1997, the suit was removed to the United States District Court for the Southern District of Indiana on Dray's motion, on the basis of diversity under 28 U.S.C. § 1332 (1994). See *Dray I,* slip op. at 1. Dray counterclaimed, seeking an accounting of, and damages for, unpaid royalties. On June 5, 1997, the district court issued a preliminary injunction that enjoined Dray "from violating U.S. Valves' exclusive rights under the license agreement, including its rights to continuations-in-part of the '282 patent." *U.S. Valves v. Robert F. Dray, Sr.,* EV–96–66–C–H–/H, slip op. at 1 (S.D. Ind. June 5, 1997) (*Dray III* ). Just over a year later, the district court issued *Dray I,* finding that Dray had violated the license agreement. The district court awarded damages and attorney fees of $241,351.17 to U.S. Valves, and permanently enjoined Dray from "selling the Dray valve (including the continuation-in-part valves) covered under the license agreement." *Dray I,* slip op. at 28.

Both parties appealed *Dray I* to the United States Court of Appeals for the Seventh Circuit. Dray asserted that the district court erred in its calculation of damages and in its finding that Dray had sold licensed product after June 5, 1997. Dray also appealed the district court's determination that he was liable for violating the license agreement. U.S. Valves appealed the amount of the damages award, asserting that it was insufficient to compensate for future harm. Dray later asked the Seventh Circuit to transfer the appeal to this court because U.S. Valves' claim for breach of contract requires application of patent law. *See Dray II,* 190 F.3d at 812. The Seventh Circuit granted Dray's motion.

## II.

■ Jurisdiction is the first issue before this court. *See, e.g., Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it."). Under 28 U.S.C. § 1332 (1994), a regional circuit has jurisdiction over appeals based on diversity jurisdiction in the district court. Under 28 U.S.C. § 1295(a)(1) (1994), this circuit has jurisdiction over appeals arising under patent law in a district court. Patent law jurisdiction "extends only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

■ U.S. Valves claimed that Dray sold valves in contravention of the license agreement. However, Dray sold more than one type of valve. The Seventh Circuit reasoned that U.S. Valves' claim required a showing that Dray sold valves covered by the licensed patents. Therefore, the claim required a determination of whether Dray's valves infringed the patents, and patent law was a necessary element of U.S. Valves' breach of contract claim. The Seventh Circuit consequently transferred the case to this circuit under 28 U.S.C. § 1338(a).

*Christianson* sets a lenient standard for jurisdiction under 28 U.S.C. § 1338(a). Recognizing that standard, this court in *Hunter Douglas v. Harmonic Design, Inc.*, 153 F.3d 1318, 47 USPQ2d 1769 (Fed. Cir.1998) asserted jurisdiction over a case alleging violation of state tort law. In *Hunter Douglas* the patentee and its licensees were accused of committing an injurious falsehood by asserting that they held exclusive rights to make or sell products covered by patents, even though the patents were invalid and unenforceable. This court determined that the action invoked issues of federal patent law. Similarly, in *Additive Controls v. Flowdata*, 986 F.2d 476, 25 USPQ2d 1798 (Fed.Cir.1993), this court asserted jurisdiction over a state law business disparagement claim in which Additive claimed that Flowdata made false accusations that Additive was infringing Flowdata's patent. To establish its claim, Additive would have had to prove that Flowdata's statement was false, which in turn required proof of noninfringement, a "substantial question of patent law." This court neither resolved that specific issue itself nor asked the court below to do so. Instead, this court vacated an injunction imposed below for lack of specificity, and remanded the case with instructions to reissue. In *Hunter Douglas* and *Additive*, this court asserted jurisdiction even though the cases involved state tort law.

As in *Hunter Douglas* and *Additive*, this case contains a substantial issue of federal patent law. The license agreement between Dray and U.S. Valves gives U.S. Valves "an exclusive right to manufacture, use, sell, advertise, and distribute the Licensed Product." To show that Dray sold valves in contravention of U.S. Valves' exclusive rights to such sales, U.S. Valves must show that Dray sold valves that were covered by the licensed patents. Since some of the valves that Dray sold were of the sliding ring variety, a court must interpret the patents and then determine whether the sliding ring valve infringes these patents. Thus patent law is a necessary element of U.S. Valves' breach of contract action. Therefore, this court reaches the same conclusion as its sister circuit and asserts jurisdiction. *See Dray II*, 190 F.3d at 813–14.

## III.

■ This court reviews factual findings of any district court bench trial for

clear error and its conclusions of law de novo. *See, e.g., Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1344–45, 53 USPQ2d 1580, 1583 (Fed.Cir.2000). Findings of fact reviewed for clear error include the amount of a prevailing party's damages. *See SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.* 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1924 (Fed. Cir.1991). Certain decisions upon which a damages calculation are based, e.g., choice of an accounting method for determining profit margin, are discretionary with the court, and are reviewed under the abuse of discretion standard. *See Unisplay, S.A. v. American Elec. Sign Co.,* 69 F.3d 512, 517 n. 8, 36 USPQ2d 1540, 1544 n. 8 (Fed.Cir. 1995); *SmithKline Diagnostics,* 926 F.2d at 1164.

■ Dray accuses U.S. Valves of terminating the license agreement in November 1995 by denying him access to royalty records, by paying less royalty than required by the agreement, and by requiring him to sign a release of liability as a condition of obtaining the contested royalty payments. The oral agreement between Dray and U.S. Valves is at the heart of Dray's accusation that he was paid an improper royalty. The president of U.S. Valves at the time of the agreement, Bobby Dray, reached the agreement with Dray. In the oral agreement, Dray agreed to reduce his royalties on sales of the licensed product by U.S. Valves to Van Dorn, but contends that this agreement applied only to an "initial order" from Van Dorn. U.S. Valves, in contrast, contends that the agreement was "ongoing."

The record shows that Dray accepted the reduced royalty rate on Van Dorn sales without protest for several years. Both Brian Ricci, one of the co-founders of U.S. Valves, and Jack Foster, a former U.S. Valves manager, testified that the agreement for reduced royalties was ongoing. The district court also received documentary evidence of the ongoing agreement in the form of Bobby Dray's "rough draft" of the agreement. Although the trial court also heard contradictory testimony from the Drays, it did not find that testimony credible on this point. Therefore, the trial court decided that Dray agreed orally to accept a reduction in the license agreement royalty rate for all sales to Van Dorn. This court defers on appeal to the district court for credibility determinations. See *United States v. Berchiolly,* 67 F.3d 634, 639 (7th Cir.1995). This court therefore detects no clear error in the district court's findings.

Further, the district court noted that Dray's acquiescence in reduced royalties over an extended period created an equitable estoppel because U.S. Valves relied on the lower royalty rate. Therefore, the district court found correctly that U.S. Valves did not underpay royalties to Dray for sales to Van Dorn. Moreover, U.S. Valves' proffer of payment to Dray was not an admission of liability for breach of contract, but merely a reasonable attempt to compromise.

■ Finally, the district court noted that the license agreement countenanced unilateral termination by the licensor only for the specific causes listed in Section Ten, which did not include failure to make records available for inspection. Therefore, Dray could not unilaterally terminate the agreement on this ground. *See Dray I,* slip op. at 18. Again, this court detects no error in the trial court's legal conclusions nor clear error in its findings of fact.

## IV.

■ This court applies the law of the applicable state in evaluating damages for breach of contract, a state claim of action. *See Gjerlov v. Schuyler Labs., Inc.,* 131 F.3d 1016, 1017, 44 USPQ2d 1881, 1883 (Fed.Cir.1997). In Illinois, the proper measure of damages in a breach of contract case is the amount that will place the nonbreaching party in as satisfactory a position as it would have been had the contract been fully performed. *See Royal's Reconditioning Corp. v. Royal,* 293

Ill.App.3d 1019, 228 Ill.Dec. 365, 689 N.E.2d 237, 239–240 (1997). If lost profits are awarded as damages for breach of contract, the amount of those profits need be proven only with reasonable, not exact, certainty. *See Schlosser v. Welk*, 193 Ill. App.3d 448, 140 Ill.Dec. 605, 550 N.E.2d 241, 244 (1990).

■ Dray admitted that he manufactured and sold infringing valves before the district court issued its preliminary injunction on June 5, 1997. After issuance of the preliminary injunction, Dray asserted that he sold only sliding ring valves, which, he further contended, differed from the licensed product and thus were not covered by the license agreement. The district court found Dray's sales before the preliminary injunction a breach of the license agreement. The district court also found that U.S. Valves had not proven, "by *clear and convincing evidence*, that Dray sold the Dray valve" after the preliminary injunction. See *Dray I* at 24 (emphasis in original). Therefore, citing the high evidentiary standard for a finding of contempt, *see D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir.1993), the district court declined to find Dray in contempt for violating the preliminary injunction. Nevertheless, the district court calculated damages on the basis of all valves sold by Dray before the injunction, as well as some valves sold by Dray after the injunction. The district court reasoned:

> U.S. Valves did prove, by a preponderance of the evidence, that Dray sold the Dray valve following the ... injunction ... more than once.... Therefore, whether Dray sold a "sliding ring" valve is immaterial to the issues in this case. So long as Dray sold just one Dray valve following the June 5 injunction order, as far as this court is concerned, Dray violated the terms of its order.

*Dray I*, slip op. at 13. The license agreement itself gives no formula for damages in the event of default. Instead it states: "[T]he defaulting party shall reimburse the other part[y] for all costs, attorney fees, and expenses reasonably incurred by the non-defaulting party ... in connection with the default." Thus, responsibility for the calculation of damages fell entirely upon the district court.

To calculate damages, the district court needed to determine the number of valves sold by Dray that were covered by the license, and then the profits U.S. Valves lost due to those sales. Dray admitted selling at various times both the original Dray valve and the sliding ring valve. The district court did not determine whether the sliding ring valve came under the license agreement, but instead neglected sales of the possibly infringing sliding ring valve altogether. The district court heard testimony on this question from both parties, but concluded that it "need not address this issue." *Id.* Yet the district court could not calculate damages accurately without a convincing determination of the number of valves that Dray sold that came within the terms of U.S. Valves' exclusive license.

The damages calculation in this case is particularly complex because Dray sold two types of valves. One type of valve sold by Dray was certainly a licensed product; the other valve – the sliding ring – may have been covered by the agreement. Rather than determine the total sales of licensed product, the district court merely used summary figures alleged to show Dray's shipments and invoices. *See Dray I*, slip op. at 24, n.10. This evidence does not show, however, the number of licensed products manufactured and sold by Dray. In the first place, the shipment summary lists a large number of different valve types, and it is not known how many came within the license agreement, and how many did not. The U.S. Valves manager who prepared the summary conceded that she could "no way ... be certain of what was shipped." *See id.* at 23. With only conflicting testimony to provide direction, the district court concluded that Dray had indeed sold licensed product both before and after the injunction date. The district

court then calculated post-injunction damages by assuming that any valves Dray sold after the injunction with the same name and same price as those sold before that date were licensed product. This method neglects other sales within the agreement, including perhaps the sliding ring valves if they fall within the agreement, and is thus incorrect.

Indeed, the most important missing piece of the damages puzzle is a determination of the status of the sliding ring valves under the agreement. Dray asserts that he sold only products that did not come under the license agreement after June 5, 1997. To properly calculate the damages from the breach, the trial court must determine the truth of that assertion by determining whether valves produced by Dray after June 5, 1997 infringe the patents licensed to U.S. Valves. The license agreement covers "[a]ll future improvements, modifications or enhancements of the Licensed Product made by the Licensor." This broad language may encompass the sliding ring valve, but that determination requires a proper analysis. On remand, the trial court may proceed to determine whether the sliding ring valves fall within the terms of the license agreement. On the other hand, the trial court may also determine that U.S. Valves had an opportunity to supply an adequate record for computation of damages, but failed to carry its burden of proof.

If the district court elects to determine, according to the best available evidence, the number of products covered by the agreement sold by Dray, it may wish to reconsider the formula for calculating lost profits. On the inadequate record before it, the district court added the invoice amounts for all valves sold by Dray before the injunction to the amounts for valves the court counted after the injunction date. This estimation arrived at the figure of $242,085. From this figure, the district court deducted Dray's royalty to arrive at "compensatory damages" to U.S. Valves of $193,668. This calculation errs in manifold ways: it is too imprecise in the determination of how many of the valves Dray sold were really licensed product; it assumes that U.S. Valves would have sold valves at the same prices that Dray did (not, e.g., for more, to cover its license fees to Dray); and it cavalierly neglects the manufacturing cost of the valves. U.S. Valves, who may be responsible for the deficient record, tries to justify this last omission with the explanation that the marginal costs of manufactured valves are negligible compared to the fixed costs such as office overhead and equipment lease. Yet U.S. Valves' own testimony at trial was that only thirty percent of the cost of production in the industry is such overhead, while the average cost of valve production is sixty-five percent of sales. These figures suggest that the marginal cost of valve production may be about forty-six percent of sales. Any calculation of the profits that U.S. Valves may have lost due to sales of licensed product by Dray requires some such cost deduction from the figure used for gross sales of licensed product.

On remand, the district court may make findings to determine the number of valves sold that were also covered by the agreement and the profits attributable to those sales. As noted before, the district court may also determine that plaintiff failed in its burden to supply a record sufficient to calculate damages.

V.

U.S. Valves argues that the district court's damages remedy does not protect against future harm. Future harm, however, is speculative. Because the district court has enjoined Dray from producing licensed products, future harm should never occur. Moreover, the license agreement gives no basis to award damages for future sales. That agreement did not even mention future sales but instead set up an ongoing arrangement in which the parties would apportion future revenues from the continuing sale of licensed valves. The agreement was to last until "the expiration

of the Patent or subsequent improvement patents" unless terminated by the licensor for specific cause or by the licensee if the licensed product proved to be unpatentable. At the time of the agreement, the '282 patent's issue date, and therefore its expiration date, were not known. Further, at the time of the agreement, the parties could not predict the issuance of continuation patents, which would extend the license agreement. Without any way to determine future profits, any award of damages for these future profits would be wholly speculative.

To introduce some degree of precision to its future-profits argument, at trial U.S. Valves presented expert testimony on lost future profits calculated with a computer forecasting model. The record before this court does not disclose whether the district court used this evidence, or whether the court "ensur[ed] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see also *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 151–52, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Without such assurance, and in the light of the impossibility of calculating at the time of the simulation the life of the license agreement, this testimony also appears conjectural.

■ Speculative or contingent profits, as opposed to those a plaintiff would certainly earn but for the default, are recoverable only when the record permits estimation of probable profits with reasonable certainty. See *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 115 N.E. 389, 390 (1917). Therefore, the district court correctly denied U.S. Valves' request for damages for future harm.

## VI.

■ Finally, Dray argues that the permanent injunction awards more relief than is justified by the license agreement because it enjoins Dray "permanently" from selling the valve covered by the license agreement. The injunction states:

> Dray is permanently enjoined from selling the Dray valve (including the continuation-in-part valves) covered under the license agreement between Dray and U.S. Valves.

This injunction applies correctly to valves "covered under the license agreement," i.e., Dray's original invention and products protected by the patents which ensued from Dray's original invention, according to the license terms. The life of the injunction thus spans only the life of the license terms or until expiration of the mentioned patents. When those patents expire, the protection for the patented valves lapses; they are no longer "covered under the license agreement." Further, the license agreement itself terminates "upon the expiration of the Patent or subsequent improvement patents." License agreement § 10.1. Thus, the wording of this injunction gives "fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). The district court's injunction is neither indefinite, nor effective in perpetuity.

## VII.

The trial court correctly construed and applied the oral and license agreements. Because the record does not support the lost profits calculation, however, this court vacates the damages award to U.S. Valves and remands the case to the district court for proper consideration, as a patent infringement action, of the applicability of the license agreement to Dray's "sliding ring" valves. Upon completion of that action the district court can determine the total number of valves covered by the license agreement that were sold by Dray, and on that basis calculate U.S. Valves' damages due to the profits it lost due to those sales.

COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*